[No. 10447. Department Two. May 6, 1913.]

GERSHON McFERON et al., Respondents, v. FRED H.
SHOEMAKER et al., Appellants.[1]

CORPORATIONS—STOCK—SALES—FRAUD—RESCISSION. Where a sale
of corporate stock was induced by false representations as to prop-
erties at a distance and the principal office of the corporation was in
a distant state and the facts not easily ascertainable, the purchaser
may rely thereon, and rescind on discovering the fraud.

CANCELLATION OF INSTRUMENTS—EVIDENCE—DEGREE OF PROOF. The
evidence for rescission of executed contracts and reconveyances of
real property must be clear and convincing.

[1]Reported in 131 Pac. 1126.

EQUITY—LACHES—SALE OF CORPORATE STOCK. While laches to prevent rescission for fraud depends upon the circumstances of each case, a delay of four weeks after discovery of the fraud, in commencing suit to rescind a sale of corporate stock, will not amount to laches, where there was no laches in not earlier discovering the fraud.

CANCELLATION OF INSTRUMENTS — RELIEF — LIABILITY OF SUBSEQUENT GRANTEE. Upon decreeing rescission of a conveyance of real estate for fraud, after the fraudulent grantee had, with his wife, mortgaged the property, and had later passed the title to his wife, who was not a *bona fide* purchaser, it is error to direct a personal judgment against the wife for the amount of the mortgage, in case of her inability to reconvey free and clear of all incumbrances.

Appeal from a judgment of the superior court for Spokane county, D. W. Hurn, Esq., judge *pro tempore*, entered January 19, 1912, upon findings in favor of the plaintiffs, after a trial on the merits before the court without a jury, in an action for rescission and other equitable relief. Modified.

*Marion A. Butler* and *Denton M. Crow* (*Robert H. Lindsay*, of counsel), for appellants.

*Samuel R. Stern*, for respondents.

MAIN, J.—The purpose of this action is to rescind an executed contract for the purchase of corporate stock and to secure the reconveyance of certain real property. The plaintiffs are husband and wife. The defendants are the son and wife, respectively, of one Benjamin F. Shoemaker, now deceased. The case was tried to the court without a jury, and judgment entered for the plaintiffs, from which the defendants appeal.

The facts out of which the litigation grew are, in substance, as found by the trial court, as follows: At the time of the transactions here involved, Fred H. Shoemaker was, and for some time prior thereto had been, the fiscal agent for the Collins Wireless Telephone & Telegraph Company (hereafter referred to as the "Collins Company"), and as such agent had complete charge of all sales of stock for the company for the states of Washington and Oregon. He was

also one of the original incorporators of the Collins Pacific Wireless Telephone & Telegraph Company, organized under the laws of the state of Washington (hereafter referred to as the "Collins Pacific Company"). This company was known as a subsidiary company to the former company. The Collins Company was organized under the laws of the state of New Jersey, with its principal place of business at Newark, in that state. Its capital stock was one million dollars, divided into a like number of shares, of the par value of one dollar per share. To assist in the promotion of the enterprise and the sale of the stock, the company caused to be issued printed matter of divers kinds, which was to be used by its agents and subagents in securing subscriptions to its capital stock. One M. E. Pearson and Mrs. S. B. Rothrock were subagents located at Spokane, Washington, working under the direction of the general agent. These subagents, with the knowledge and consent of Fred H. Shoemaker, were permitted to make use of the printed matter and make statements relative to the company, its equipment, operations, etc.

The plaintiff Gershon McFeron first became interested in the purchase of the stock of the company through Mrs. Rothrock, who presented to him its literature, and informed him that the company was operating commercially, had contracts, and was making additional contracts with steamship companies for the purpose of installing the Collins wireless, and that stations had been erected at Seattle, Tacoma, Portland and other places. It was stated that the value of the stock was then ten dollars per share and would soon advance to twelve dollars, and that the then present was the last opportunity to secure this stock at the former price. Other statements were made of like import, all of which were false and untrue. On March 25, 1910, McFeron, Pearson, Mrs. Rothrock and Fred H. Shoemaker met in Spokane, where the same statements, in substance, were made by Shoemaker to McFeron which previously had been made to him by Mrs. Rothrock. The purpose was to induce McFeron to subscribe

for the Collins stock. Thereupon McFeron did subscribe on this occasion for five hundred shares of the stock, for which he agreed to pay five thousand dollars, at the same time indicating that if his wife were willing, he would take five hundred additional shares. Along with the Collins stock, he was to receive, without additional cost, a like number of shares in the Collins Pacific Company. On this occasion, Shoemaker prepared two notes, one for four thousand dollars and one for one thousand dollars, which were signed by McFeron and delivered to Shoemaker. A third note for five thousand dollars was prepared and given to Pearson, which McFeron was to sign in the event that he concluded to make the additional purchase.

Two days later and on Sunday, March 27th, Pearson went to the home of the McFerons, which was about ten miles distant from the city of Spokane, and there, by means of the same representations which had previously been made, induced the McFerons to take the five hundred additional shares. Thereupon, McFeron signed and delivered the five thousand dollar note, which was dated as of the date of the previous transaction. At this time Fred H. Shoemaker and Benjamin F. Shoemaker, his father, were at Walla Walla on a stock selling mission. When informed that McFeron had taken the additional shares, both went to Spokane. At the time of the first transaction, McFeron had informed Shoemaker that he had no money, but did have land, and it was apparently understood that the notes were only a temporary expedient until the exchange of the land for the stock could be effectuated. The land had been examined by Shoemaker prior to his return to Spokane on March 29th. After the arrival of the Shoemakers in Spokane, they, Pearson, Mrs. Rothrock, and McFeron met for the purpose of arranging for the transfer of the real estate then owned by the McFerons in payment for the stock. The real property conveyed upon this occasion by McFeron was valued at sixteen thousand five hundred dollars. The stock which he had sub-

scribed for he was to take at ten thousand dollars. The difference between these two sums was met by the delivery to him of a check and some notes of other parties which were held by Fred H. Shoemaker. At the direction of Fred H. Shoemaker, Benjamin F. Shoemaker's name was inserted in the deed as the grantee. Subsequently the property was held by Benjamin F. Shoemaker for the benefit of his son. The father and son were associated together in the transactions, not only in this case, but in others involving the transfer of real estate in payment for the stock. Within a few weeks thereafter, Benjamin F. Shoemaker and his wife mortgaged the property which had been conveyed by McFeron, to secure a loan in the sum of six thousand dollars.

In the month of April, 1910, Fred H. Shoemaker made a trip to the home office of the Collins Company. Shortly thereafter a reorganization took place and the Continental Wireless Telephone & Telegraph Company was organized, with Fred H. Shoemaker as one of its officers. The holders of the stock in the Collins Company began receiving circulars and letters requesting that they exchange their then stock in that company for Continental stock. McFeron, in response to these requests, surrendered his Collins Pacific stock, it being the only stock that had been issued to him, and received a certificate for stock in lieu thereof in the Continental Company. The property transferred by McFeron in payment for the stock was, a few days before his death, deeded by Benjamin F. Shoemaker to his wife. In receiving the title, however, Mrs. Shoemaker did not take it as a *bona fide* purchaser for a valuable consideration.

During the early part of July, 1911, McFeron learned for the first time that he had been defrauded in the transactions, and that the stock in the Continental, as well as that of the other two companies, was practically worthless and always had been; that they were all three paper corporations, with substantially no tangible or intangible assets. The findings of the trial court in this case are extensive and the state-

ment of facts voluminous, but the above is a brief epitome of the ultimate facts as found by the court. The present action was begun on July 27, 1911, and in due time came on for trial. At the conclusion of the trial the court decreed that the contract should be rescinded and that the real property should be reconveyed to the respondents. In addition to this, the decree provides that, in the event that Mrs. Shoemaker does not reconvey the property free from the lien of the mortgage above mentioned, that a personal judgment shall be entered against her for an amount equivalent to the difference between six thousand dollars and the amount which McFeron had realized upon the check and notes that he originally received from Fred H. Shoemaker. The amount for which this personal judgment would be entered would be $1,865.65.

The questions here for determination are: First. Was McFeron justified in relying upon the statements which induced the transactions? Second. Is the evidence sufficiently convincing to sustain the judgment directing a rescission and reconveyance? Third. Is McFeron chargeable with laches? And fourth. Did the court err in entering a conditional personal judgment against Mrs. Shoemaker?

I. It is now argued that, inasmuch as no fiduciary relation existed between McFeron and the parties with whom he was dealing, he had no legal right to rely upon the representations which induced him to make the purchase of the stock. It must be remembered that the properties which the corporations were represented to own and operate were at a distance; that the principal office of the Collins Company was in a distant state, and the truth or falsity of the statements made to him was not easily ascertainable. Under such circumstances, a purchaser is justified in relying upon representations made to him by the seller.

In *Lindsay v. Davidson*, 57 Wash. 517, 107 Pac. 514, it is said:

"All that need be said upon the law of the case is a reference to what was said by this court in actions of this char-

acter in the late cases of *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054, and *Bailie v. Parker*, 56 Wash. 353, 105 Pac. 834, where it was held that a vendee may rely upon representations of his vendor where the property is at a distance, or where for any other reason the falsity of the representation is not readily ascertainable."

II.    The contention is made that the evidence in this case falls short of that certainty of proof which the law requires before executed contracts will be rescinded and reconveyances of real property directed. It may be admitted, without discussion, that the rule in such cases is that the evidence must be clear and convincing. To review the evidence in the present case would extend this opinion to unreasonable length and serve no useful purpose. It is sufficient to say that, in our opinion, the charge of fraud is sustained by proof which is abundantly clear and convincing. Indeed, it is difficult to see how a disinterested perusal of the transcript of the evidence and the exhibits in the case could lead to any other conclusion.

III.    Whether or not laches will prevent a recovery must depend upon the circumstances of each particular case. In *Romaine v. Excelsior Carbide & Gas Machine Co.*, 54 Wash. 41, 103 Pac. 32, it is said:

"That the question of laches in this kind of a case bears no relation to ordinary statutes of limitation, where conditions of others are not changed or the rights of others not imperiled by lapse of time, and that the principle of laches still adheres in the substance of equitable relief and is, therefore, to be determined by the court under the circumstances of each particular case, has been the settled rule of law in this state since the decision of the case of *Gay v. Havermale*, 27 Wash. 390, 67 Pac. 804."

We think that McFeron was not guilty of laches. It appears that, within a period of four weeks time after he discovered the fraud which had been practiced upon him, suit was begun. In view of all the attendant facts and circum-

stances, it cannot be said that he is chargeable with laches because of the fact that he did not earlier discover the fraud.

IV.   It was decreed by the trial court that Mrs. Shoemaker should reconvey the property free and clear from the incumbrance of the six thousand dollar mortgage or suffer a personal judgment for $1,865.65 to be entered against her. We have been cited to no principle of law, and know of none, by which the entry of this personal judgment against Mrs. Shoemaker can be sustained.

The case will be remanded with direction to the superior court to modify the judgment by eliminating the portion thereof which provides for a personal judgment against Mrs. Shoemaker in the sum of $1,865.65. Beyond this, the judgment is affirmed.   Mrs. Shoemaker will recover one-half of the appellant's costs in this court.

MOUNT, MORRIS, ELLIS, and FULLERTON, JJ., concur.